**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MUSADDIQ REHMAN, Plaintiff,

v.

ERNST & YOUNG U.S. LLP; ERNST & YOUNG GLOBAL LIMITED; EY GLOBAL

DELIVERY SERVICES LIMITED; ZAKIR HUSSAIN; TRACI GUSHER; SONIA SANDE;

RACHELLE SHARRER; LINDA CASTANEDA; and MARIA MOLINA MONROY,

Defendants.

Civil Action No. _____

**JURY TRIAL DEMANDED**

**COMPLAINT**

(Defend Trade Secrets Act; SOX Section 806 Retaliation; State Law Claims; Declaratory and
Injunctive Relief)

**<u>INTRODUCTION</u>**

**EY's Calculated Misappropriation**

Plaintiff Musaddiq Rehman brings this action against Ernst & Young U.S. LLP ("EY US"), Ernst
& Young Global Limited ("EY Global"), EY Global Delivery Services Limited ("EY GDS"),
Zakir Hussain, Traci Gusher, Sonia Sande, Rachelle Sharrer, Linda Castaneda, and Maria Molina

Monroy (collectively, "Defendants") for misappropriation of trade secrets, whistleblower retaliation, conversion, unjust enrichment, defamation, intentional infliction of emotional distress, unpaid wages, breach of fiduciary duty, civil conspiracy, and declaratory and injunctive relief.

**EY's Calculated Misappropriation**

Defendants misappropriated a multi-million-dollar suite of artificial intelligence components that Mr. Rehman independently conceived, designed, and developed — investing more than $6,000 in documented personal capital before any EY directive — and used that Component Suite to generate confirmed revenue of not less than $8.9 million and a projected $300 million pipeline, crediting none of that revenue to Mr. Rehman's performance metrics.

Defendants demanded knowledge transfer to junior personnel immediately before terminating Mr. Rehman, and fabricated his Gross Target Engagement Revenue ("GTER" or "Revenue") to manufacture a pretextual basis for separation while retaining his work product without compensation.[1]

EY GDS is named as a defendant by virtue of its direct participation in its funding decision for FY2026, its provision of development personnel and delivery capacity under Mr. Rehman's direction, and its ongoing receipt of the Component Suite's commercial benefits, making it a joint tortfeasor in the misappropriation, unjust enrichment, and conversion alleged herein.

---

[1]Federal courts have sustained misappropriation and unjust enrichment claims against EY where engagement access was used to appropriate innovator IP. *Exothermics, Inc. v. Ernst & Young U.S. LLP*, No. 1:24-cv-00290 (D.N.H. 2024), involves active claims that EY induced proprietary technology disclosure during consulting, then filed firm-owned patents (U.S. App. No. 18/155,308) on the same invention. *Ernst & Young LLP v. Ryan, LLC*, No. 01-21-00603-CV (Tex. App. 2023), allowed tortious interference and trade secret misappropriation claims to proceed where EY allegedly used audit access to reverse-engineer proprietary tax methodologies.

In February 2025, EY Global approved FY2026 capital to deploy the platform Mr. Rehman built. Mr. Rehman received no benefit from that infusion — no compensation, no credit, no equity stake — even as EY continued deploying him to conduct client demonstrations of the same platform and to transfer its architecture to junior personnel in preparation for his termination.

**EY's Systematic Elimination of Senior Principals**

EY operates a coordinated mechanism to eliminate senior principals once their commercially valuable innovations are captured. The firm suppresses internal recognition of the innovator while deploying the innovation commercially; manufactures performance deficiencies through fabricated metrics and impossibly inflated targets; imposes financial coercion through reduced final-year compensation and two-year non-competes that were never negotiated; and destroys professional reputation on exit to prevent rebuilding elsewhere — all enforced through agreements principals never received, never negotiated, and cannot challenge.[2] EY's own OWBPA disclosure reveals that 27 of 28 principals separated in connection with EY's nationwide Partner/Principal Capacity Review were over the age of 40.

**Retaliation for Protected Disclosures**

---

[2] Recent litigation confirms EY's pattern of manipulating performance metrics to retaliate against protected activity. In *Ghose v. Ernst & Young LLP*, No. 1:22-cv-07881 (S.D.N.Y. 2022), EY allegedly slashed a "differentiating" rating to "needs to progress" — the lowest possible — after the plaintiff refused to approve illegal transactions, while simultaneously truncating and concealing revenue calculations. *Howie v. Ernst & Young LLP*, No. 1:25-cv-05973 (S.D.N.Y. 2025), further alleges that revenue metrics were weaponized to justify forced retirement after NOCLAR reporting.

Plaintiff suffered retaliation for disclosing conduct he reasonably believed violated mail/wire fraud statutes (18 U.S.C. §§1341, 1343) and SEC books-and-records requirements (15 U.S.C. §78m(b)(2), Rules 13b2-1, 13b2-2).

Plaintiff made his first set of protected communications to Defendant EY's Human Resources Director, Defendant Maria Monroy and Investigations Lead Defendant Rachelle Sharrer. Plaintiff shared that senior professionals working 50–80 hours weekly were discouraged from reporting time spent on business development activities and project delivery work, thereby inflating engagement profitability and misrepresenting value of services provided to clients, including SEC-registrant clients. Plaintiff also provided a spreadsheet documenting internal meetings being charged to SEC-registered client travel budgets. In response to those disclosures, EY Head of HR Sonia Sande issued a defamatory Last Chance Notice ("LCN"), capping Plaintiff's compensation for Fiscal Year 2025. Plaintiff reached out to report his concerns about the LCN to EY PPC Deputy Presiding Partner Al Mendoza, who acknowledged "structural concerns." Plaintiff then filed an internal ethics complaint with EY Ethics Investigator Megan Roberts. Plaintiff's ethics complaint was dismissed on July 23, 2025. Plaintiff then filed a charge of discrimination with the EEOC (520-2025 07690) on August 6, 2025 challenging the issuance of the LCN as discriminatory. Defendants issued a notice of termination on the same day he filed his EEOC charge. On September 30, 2025, Plaintiff's last day of work, Defendant Zakir Hussain, Plaintiff's supervisor, circulated an email misrepresenting Plaintiff's Fiscal Year performance. Plaintiff credibly fears that EY will continue to retaliate against him through arbitrarily offsetting Plaintiff's 2025 earnings.

During the 2025 Fiscal Year, Defendants received a suite of artificial intelligence enabling components conceived and built at Mr. Rehman's personal expense and using Mr. Rehman's personal equipment and tools. Defendant Hussain, Plaintiff's supervisor, directed Plaintiff to formalize and commercialize this suite for EY's benefit. Defendants obtained $2.3 million in FY2026 funding for deploying this component even as they excluded Mr. Rehman from any

benefit of this deployment. Defendant Hussain minimized the platform internally and overtly sought to fire Mr. Rehman and throttle his 2025 compensation while publicly praising and demanding knowledge transfer regarding the suite without executing a single IP assignment instrument.


## RESERVATION OF CLAIMS


Charges of age and sex discrimination and related retaliation are currently pending before the EEOC under Charge No. 520-2025-07690 and Charge No. 520-2026-01416. Statistical and documentary evidence supporting those charges — including the OWBPA disclosure showing 27 of 28 separated principals were over age 40 — is incorporated in the Statement of Facts below as background.[3] Plaintiff expressly reserves the right to amend this Complaint as of right under Fed. R. Civ. P. 15(a)(1) upon issuance of applicable Right-to-Sue letters. Nothing in this Complaint constitutes a waiver of those reserved claims.


## I. JURISDICTION AND VENUE


**1.**     This action arises under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 et seq., and Section 806 of the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A.


**2.**     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a).

---

[3] The foregoing matters collectively establish an institutional pattern relevant to discriminatory motive under *Teamsters v. United States*, 431 U.S. 324 (1977). Simpson (120 partners over 40 purged); *Ward v. EY* (2018) (fee-generating partner dismantled post-harassment report, perpetrators retained); *Rihan v. EY Global* (UK 2020, £10.8M damages, ethics complainant destroyed while leadership shielded); *Ghose* (rating falsified post-complaint); *Howie* (active federal SOX case, near-identical separation mechanics).

**3.**     This Court independently has diversity jurisdiction pursuant to 28 U.S.C. § 1332: Plaintiff is a citizen of Florida; Defendants are citizens of Delaware, England and Wales, India, North Carolina, Pennsylvania, and New York; and the amount in controversy vastly exceeds $75,000.

**4.**     Venue is proper pursuant to 28 U.S.C. § 1391(b): EY US maintains its principal place of business in New York; the wrongful acts — including fabrication of performance metrics, issuance of the LCN, the separation decision, the confidentiality breach, and the misappropriation — were conceived, directed, and executed from EY's New York offices; and the commercial engagements with Client C, Client B, and Client D were managed from New York.

**5.**     Plaintiff timely filed a SOX whistleblower complaint with OSHA on January 5, 2026. OSHA issued a procedural dismissal without reaching the merits on January 14, 2026 (Exhibit A). More than 180 days have elapsed since filing. Plaintiff has not acted in bad faith or caused delay. Jurisdiction is proper under 18 U.S.C. § 1514A(b)(1)(B).

**6.**     Plaintiff has filed EEOC Charge Nos. 520-2025-07690 and 520-2026-01416 alleging discrimination and retaliation on the basis of age and sex. Both charges remain under active EEOC investigation. Plaintiff does not assert those civil rights claims in this Complaint and expressly reserves the right to amend upon receipt of applicable Right-to-Sue notices.

## II. THE PARTIES

**7.**     Plaintiff Musaddiq Rehman is an individual residing in Florida. At all times material to this Complaint, Plaintiff served as a Principal[4] within EY US's AI & Data competency, bringing twenty years of expertise in digital transformation and Data & AI-platform design. Plaintiff joined EY US in approximately June 2010, devoted himself to company interests often working fifty to eighty hours weekly, and was separated on September 30, 2025, at age 51 after a fifteen-year EY tenure.

**8.**     Defendant EY US is a Delaware limited liability partnership with its principal place of business in New York, New York. EY US is a registered public accounting firm providing audit, tax, and advisory services to clients that file reports with the SEC.

**9.**     Defendant EY Global is a company limited by guarantee incorporated in England and Wales that coordinates strategy, shared services, technology investment, and governance standards across EY member firms globally, including EY US, and directly approved FY2026 funding towards developing Rehman's Component Suite.[5]

**9(a).**     Defendant EY GDS is a private limited company incorporated in India that provides technology, data, and AI service-delivery support to EY member firms globally. EY GDS participated in funding meetings for the platform, provided development personnel under Mr. Rehman's direction in furtherance of platform delivery and the Finance Data Appliance ("FDA")

_____

[4] *See* EY's Answer in *Ghose v. Ernst & Young LLP*, No. 1:22-cv-07881-RA-VF (S.D.N.Y.), ECF No. 18 (filed Nov. 28, 2022). EY's admissions include: "a 'Principal' is the title for the non-CPA equivalent to a Partner at EY" (¶19); "EY admits that Ghose was employed by EY, and that Ghose became a Principal in 2015. EY admits that… her employment with EY ended effective January 7, 2022" (¶¶ 1, 17) (italics added).

[5] *EY Reduces Headcount and Costs Under CEO Janet Truncale*, Int'l Accounting Bulletin (Mar. 2, 2026), https://www.internationalaccountingbulletin.com/news/ey-reduces-headcount/. According to that report, in the fiscal year ending June 27, 2025, EY Global collected $1.8 billion in mandatory assessments from its national member firms; member firms paid a further $3.2 billion for centrally provided shared services including shared technology platforms. EY Global's direct approval of $2.3 million in FY2026 capital for the Component Suite — the platform at the center of this action — is consistent with and reflective of its active role in governing and financing the commercial deployment of AI platform technologies across the EY network.

integration, received the benefit of Plaintiff's intellectual property through its operational participation, and is subject to personal jurisdiction pursuant to Fed. R. Civ. P. 4(k) and the DTSA's nationwide service-of-process provision.[6] EY US, EY Global, and EY GDS are sometimes collectively referred to herein as "EY."

10.    Defendant Zakir Hussain ("Hussain") is, upon information and belief, a resident of North Carolina who at all relevant times served as Principal and direct supervisory leader within EY's AI & Data competency. Hussain formally assigned Plaintiff to lead the platform development that is the subject of this action, exercised supervisory authority over Plaintiff's work and compensation, publicly disparaged the platform as a "pipe dream" to Principals whose assessments shaped Plaintiff's performance evaluation while simultaneously praising it commercially, and entered a materially false GTER figure of $1.3 million into EY's permanent records on Plaintiff's final day. Hussain is sued in his individual and official capacities.

11.    Defendant Traci Gusher ("Gusher") is, upon information and belief, a resident of Pennsylvania who at all relevant times served as a Principal within EY's consulting practice. Gusher directed Hussain to demand knowledge transfer of the Component Suite, breached the confidentiality of internal ethics proceedings by disclosing investigation details to EY partners — directly causing the blocking of Plaintiff's approved Finance competency transfer — and coordinated with Hussain to appropriate the Platform while excluding Plaintiff from strategy discussions. Gusher is sued in her individual and official capacities.

12.    Defendant Sonia Sande ("Sande") is, upon information and belief, a Partner serving as EY's Americas Consulting Talent Leader — Partner/Principal Matters at all relevant times. On April 7, 2025, Sande issued the Last Chance Notice ("LCN") described in this Complaint, declared

---

[6]EY GDS is subject to personal jurisdiction pursuant to Fed. R. Civ. P. 4(k) and the DTSA's nationwide service-of-process provision, 18 U.S.C. § 1836(d).

it "final" with no appeal, and refused to modify its false characterizations despite Plaintiff's written rebuttal — while simultaneously directing Plaintiff to align on "the true mix of BD vs paid delivery work," thereby acknowledging the very unbilled activities the LCN falsely branded as dishonest. A true and correct copy of the LCN is attached as Exhibit B. Sande is sued in her individual and official capacities.

13.     Defendant Rachelle Sharrer ("Sharrer") is, upon information and belief, an Assistant Director on EY's Employee Investigations Team who initiated and led the Time & Expense investigation against Plaintiff beginning January 28, 2025. Sharrer conducted an investigation targeting six partners and principals — all between the ages of 44 and 51 — whose findings formed the pretextual basis for the LCN and Plaintiff's separation. Sharrer is sued in her individual and official capacities.

14.     Defendant Linda Castaneda ("Castaneda") is, upon information and belief, a Managing Partner within EY who participated in the decisions to issue the LCN and to separate Plaintiff. Castaneda participated in the August 6, 2025 termination discussion with Defendant Monroy on the same day Plaintiff filed EEOC Charge No. 520-2025-07690. Castaneda is sued in her individual and official capacities.

15.     Defendant Maria Molina Monroy ("Monroy") is, upon information and belief, an HR Director within EY who initiated the T&E investigation against Plaintiff on January 28, 2025, participated in the August 6, 2025 termination decision, communicated Plaintiff's separation in a notice that misrepresented his status as a "partner" rather than a Principal, and refused to provide Plaintiff access to his own HR file and ethics investigation notes without any lawful basis. Monroy is sued in her individual and official capacities.

### III. FACTUAL ALLEGATIONS

**A. Plaintiff's Independent Development of the Component Suite**

16.     Beginning in January 2024, Plaintiff independently conceived, designed, and developed a proprietary artificial intelligence platform — the AI & Data Component Suite (the "Component Suite" or "Platform") — investing more than $6,000 in documented personal capital, using exclusively personal equipment and personal software licenses, prior to any EY directive.

17.     By July 9, 2024 — the date of EY's first formal assignment directive — Plaintiff had completed Minimum Viable Products ("MVPs") of the majority of the eight components of the Component Suite on personal equipment using personal software licenses, with no EY hardware, no EY software, and no EY resources of any kind.

18.     The eight MVP components independently conceived and built prior to July 9, 2024 are: (i) AI-powered schema creation; (ii) synthetic data generation; (iii) data quality assessment; (iv) knowledge graph integration; (v) harmonization algorithms; (vi) lifecycle management; (vii) master data fit/gap analysis; and (viii) domain-specific requirements generation (collectively, the "Components").

19.     The conception dates, development tools, and personal capital expenditures for each Component are documented by receipts, invoices, purchase records, and development records predating July 9, 2024, and are further corroborated by provisional patent applications filed in November 2025 reflecting January 2024 conception dates. True and correct copies of the two patent applications are attached and included in Exhibit C.

**20.**     Plaintiff maintained the secrecy of the Component Suite through restricted access, personal control over source materials, and limited disclosure on a need-to-know basis within EY's confidential client engagement infrastructure.

**21.**     All client demonstrations of the Component Suite were conducted within EY's controlled environment — EY servers, EY-managed presentation infrastructure — under EY's standard client engagement confidentiality terms; no proprietary architectural details, source code, or design specifications were disclosed to any third party through those demonstrations.

**22.**     The Component Suite derives substantial independent economic value from not being generally known or readily ascertainable by persons outside EY, as demonstrated by $8.9 million in confirmed commercial engagements and a $300+ million projected pipeline.

**B. EY's Formal Adoption and the Work-Made-For-Hire Defense**

**23.**     On July 9, 2024 — more than six months after Plaintiff independently conceived and completed MVPs of the majority of the eight Components on personal equipment — Defendant Hussain formally directed Plaintiff to lead the design and development of what EY designated the "AI-Ready Data Co-Pilot" platform.

**24.**     Because all eight Components existed as independently developed MVPs before July 9, 2024, EY's July 9 directive cannot constitute the origin of the Component Suite; EY directed the integration, refinement, and commercialization of a pre-existing invention, not the creation of a new one.

25.     In fact, EY failed to execute any IP assignment instrument at any time — not at the July 9 directive, not at the February 2025 funding approval, not during the knowledge transfer sessions, and not at or after Plaintiff's separation — leaving EY without any contractual or legal basis to claim ownership of any component or refinement.

26.     EY leadership formally designated the Component Suite an "EY Service Disruptor" — EY's internal designation for technologies expected to transform its commercial service offerings — a designation applied to a platform EY never validly acquired.[7]

27.     In or around August 2025, personnel of Defendant EY GDS and EY's Finance competency, under Mr. Rehman's direction, completed integration of the Component Suite with EY's Finance Data Appliance ("FDA") — an integration connecting Mr. Rehman's pre-existing Component Suite to EY's Finance platform infrastructure.

28.     The FDA integration was a direct refinement to the pre-existing Component Suite architecture. It did not constitute creation of a new work and did not impact ownership of the underlying Component Suite.

29.     Following FDA integration, the Component Suite became the only demo-ready platform available for client presentations; it was demonstrated to all major clients from August 2025

_____

[7]EY publicly markets a unified global AI-powered finance transformation practice that encompasses precisely the capabilities Plaintiff independently developed: AI-driven data schema creation, synthetic data generation, knowledge graph integration, and data harmonization automation. *See* Kevin Brown, *Finance Transformation's Real Value in Private Equity*, EY US Insights (Mar. 3, 2026), https://www.ey.com/en_us/insights/private-equity/finance-transformations-real-value-in-private-equity (describing EY's AI finance transformation platform as an "adaptive, insight-driven platform" linking strategy, operations, and investment through a unified data backbone, powered by AI and agentic automation, and noting EY deploys more than 11,000 professionals globally in finance and global business services transformation). EY's public designation of the Component Suite as a commercial "Service Disruptor" while simultaneously suppressing Plaintiff's authorship is directly inconsistent with arm's-length treatment of an employee's incidental work product and is probative of willful misappropriation.

through September 2025, including the Client C engagement generating $2 million in contracting-stage revenue.

**C. Commercial Value and the $2.3 Million FY2026 Funding**

**30.**     EY Global confirmed $2.3 million in direct funding for platforms including the Component Suite for FY2026 deployment.

**31.**     That FY2026 funding was approved for components EY did not own, had not validly acquired, and for which it had no IP assignment instrument.

**32.**     Mr. Rehman received no benefit from the FY2026 capital infusion — no compensation, no equity stake, no performance credit, no revenue share — even as EY continued to deploy him to conduct client demonstrations of the same platform and to transfer its architecture and methodology to junior personnel.

**33.**     By September 2025, the Component Suite had generated confirmed commercial engagements totaling not less than $8.9 million:

| | | |
|---|---|---|
| Client C | $2,000,000+ | Contracting in progress as of September 9, 2025 |
| Client B | $4,900,000+ | Contracting in progress as of September 2, 2025 |
| Client D | $2,000,000 | M&A MDM engagement as of August |
| TOTAL CONFIRMED | $8,900,000+ | |

**34.**     Beyond confirmed engagements, the Component Suite supported active pursuit of additional client opportunities, with EY's internal projections estimating a $300+ million pipeline in FY2026 and beyond.

**35.**     On June 17, 2025, EY Senior Manager Amer Abed Rabbo wrote internally: "This is the solution that Musaddiq is leading. The solution is up and running and ready for demo with client immediately. I think it will become part of every data project next year."

**36.**     On July 17, 2025, EY Global Director Emilio Jimenez Diaz wrote to EY Global Consulting AI Leader Cameron Wall: "Musaddiq was key SME [subject matter expert] when we got funding to build Data Fabric proposition. Built AI Powered Data copilot which I think very interesting for Global reach as accelerator."

**37.**     Between August 24 and 25, 2025, Plaintiff conducted more than 20 client demonstrations of the Component Suite. On August 15, 2025, the Platform received enthusiastic executive-level endorsement at the Client F CIO Workshop, with clients describing it as "awesome" and stating they "LOVE visualizations."

**38.**     In the aggregate, the Component Suite supported active pursuit of additional client opportunities in FY25 and FY26. Plaintiff received no additional compensation for any of those engagements.

**39.**     On September 2, 2025, EY Managing Director David Looby emailed Hussain and Jim Deutsch:

"We have 3 big engagements in motion at Client B., for AI&D [...] 3. Managed Capacity project for roughly $2M a. New request last couple weeks Musaddiq was driving b. Musaddiq has the

client relationship c. Interest in the AI ready data solution – especially synthetic data d. Bring resources with supply chain and data fabric e. Ready to start this month The 3rd project is the one most at risk. I am at capacity with the first 2 and would welcome Musaddiq as continuing to lead or if needed a new PP. The client is tricky to handle, so we need to be careful if we pick a new person."

40.     On September 2, 2025, Client E. emailed Ellen Chen: "We finished intro convos with the three suggested partners to replace Musaddiq — Initial thoughts, we would not say any of them hit the mark… Jon Yee we would say keep on the burner, but still felt not 100% sure… The other two candidates were a hard pass."

### D. Escalating Retaliation After Each Protected Communication

41.     EY's cost-cutting measures following the failure of Project Everest included replacing U.S.-based executive assistants with overseas personnel, creating systematic misalignment in expense coding practices that formed the pretextual basis for the investigation targeting Mr. Rehman.

42.     On January 28, 2025, Defendant Monroy sent Plaintiff a "Confidential Workplace Matter" email initiating a Time & Expense investigation, copied to Defendant Sharrer, attaching a spreadsheet of flagged items.

43.     Between January and May 2025, Plaintiff reported concerns to Defendants Monroy and Sharrer about EY's outdated, inconsistent, and poorly enforced billing policies affecting EY's client billing integrity.

**44.** Plaintiff's reports included: (a) coding errors caused by miscommunication between Plaintiff and his remote executive assistant introduced by EY's cost-cutting decision to rely on overseas EAs; (b) widespread failure by EY partners and principals to log all hours worked, resulting in utilization and labor cost reporting that did not reflect actual effort; and (c) project profitability reporting based on commercially convenient hours rather than actual hours expended — a practice Plaintiff identified as materially misrepresenting engagement economics to SEC-registrant clients.

**45.** EY's own October 2025 EEOC Position Statement acknowledged a firm-wide analysis of partners who submitted reimbursed expenses on days when no client time was reported. The investigation targeted six partners and principals — all between the ages of 44 and 51.

**46.** On April 7, 2025, Defendant Sande issued Plaintiff the Last Chance Notice ("LCN"), falsely characterizing Plaintiff as exhibiting "dishonesty," "poor judgment," "lack of integrity," and a need for coaching in interacting with support staff, while simultaneously capping Plaintiff's FY2025 compensation. A true and correct copy of the LCN is attached as Exhibit B.

**47.** Defendant Sande declared the LCN "final" on April 10, 2025, with no appeal process available.

**48.** On April 16, 2025, Plaintiff emailed Defendants Sande and Monroy requesting formal guidance on EY time and expense tracking, specifically asking how to log "50 to 80 hours a week" of work including BD activities, self-learning, and weekend client preparation.

**49.** Defendant Sande's April 16, 2025 reply directed Plaintiff to align on "the true mix of BD vs paid delivery work" and acknowledged that "what we choose to invoice clients is a separate

commercial decision" — directly contradicting the LCN's "dishonesty" characterization of the identical conduct.

50.     On April 21, 2025, Plaintiff submitted a further written rebuttal challenging each LCN finding, documenting that: the "dishonest" characterization was unsupported by any finding of intentional conduct; $700+ in expenses his executive assistant failed to bill to clients were never credited to him; and the investigation asked him to recall time-reporting practices from his Senior Manager role more than five years prior.

51.     On May 13, 2025, Partner Forum Representative Al Mendoza wrote to Plaintiff acknowledging the LCN process was structurally defective, stating: "Should we consider reviewing the need for an appeal process? Perhaps we should also look into ensuring more transparency in the overall process and the types of punishments for rule violations."

52.     On June 10, 2025, Plaintiff filed an ethics complaint against Defendant Gusher and other AI & Data leadership through EY's Internal Ethics Hotline, presenting substantial evidence of systematic targeting, discriminatory treatment, governance failures, exclusion from leadership activities, malicious sharing of confidential HR investigation details, and career obstruction.

53.     Despite documented patterns spanning multiple years and affecting multiple principals, EY's ethics investigation found zero code of conduct violations and dismissed Plaintiff's complaint on July 23, 2025 — forty-three days after filing.

54.     On July 10, 2025, Defendant Hussain and Kevin Barboza demanded that Plaintiff transfer knowledge of the Platform to Barboza. Plaintiff learned that Defendant Gusher had directed Hussain to make that demand.

**55.**     On July 20, 2025, Plaintiff emailed Hussain expressing concern that the knowledge transfer was being used to replicate his work: "90% of what Kevin walked through is already built/designed in AI Data Co-pilot so surprised to see it being kicked off again under a different name/title."

**56.**     On July 20, 2025, Hussain requested a meeting stating: "If I recall correctly, the initial discussions with Vignesh all stemmed from discussing what you had initiated with the copilot. We then tried to take forward to figure out how to scale it and how to built upon it further. we were asked to work with Vignesh's ream first because that's where the funding sat. But for obvious reasons, no progress was made as Vignesh was on his way out. Now that he has left the firm, and in parallel we have been asked to scale this service disruption, we need to take on these projects ourselves. We have been given some targets for this year that we have to achieve. i would like to find some time with a small group - you, me, Kevin, and Matt. Let's take a look at what you've already built, and then let's take a look at what Kevin had outlined to determine 1. where there is overlap 2. where there is opportunity to extend the functionality 3. how we scale and deploy it on as many of our projects as we can and show significant efficiencies at scale - in all of our data business across AI&D, finance, and other fops[...]"

**57.**     On July 30, 2025, Hussain sent a Teams message to 12 or more Principals characterizing the Component Suite as a "pipe dream," stating: "We are not a product company. This in my opinion will never materialize. We will eventually end up purchasing these tools."

**58.**     Two days later, on August 1, 2025, Hussain wrote to 30 or more EY participants: "Thanks for setting up this call and sharing this with the broader team. Looking forward to leveraging this across all our data engagements."

**59.**     The July 30 and August 1 communications were not inconsistent opinions; they were context-dependent statements designed to serve a single purpose: depreciate the Component

Suite's perceived value in the performance evaluation record while commercially exploiting it in client-facing contexts.

**60.**     On August 6, 2025, Defendant Monroy emailed Plaintiff a separation notice that misleadingly described all affected individuals as "partners" and stated separations resulted from a leadership decision for "performance reasons." A true and correct copy is attached as Exhibit E.

**61.**     On August 11, 2025, EY issued a Required Disclosure in connection with a nationwide Partner/Principal Capacity Review covering approximately 30 partners and principals, the overwhelming majority of whom were over age 40. A true and correct copy is attached as Exhibit F.

**62.**     On September 16 and 19, 2025, Plaintiff made written requests to Defendant Monroy and EY Associate Director Leila S.A. for his complete HR file and ethics investigation notes. Both requests were denied without any legal basis. A true and correct copy is attached as Exhibit G.

**63.**     Plaintiff's separation became effective September 30, 2025. On that date, EY entered into Plaintiff's firm records a grossly understated revenue figure of approximately $1.3 million for FY2025 performance.

**64.**     EY's internal revenue dashboard had consistently reflected approximately $5.7 million in Plaintiff-attributable revenue.

**65.**     EY terminated Plaintiff's system access on September 30, 2025 — the same day the false revenue figure was entered — preventing Plaintiff from reviewing, rebutting, or preserving evidence of the accurate figures.

**E. Post-Separation**

66.     Following Plaintiff's separation, Defendants have continued to use, demonstrate, and commercially exploit the Component Suite — including in client engagements with SEC registrants — without compensation to Plaintiff and without executing any IP transfer instrument.

67.     In November 2025, during mediation proceedings, Defendants produced for the first time a document characterized as a "2023 Agreement." The 2023 Agreement purports to reference and incorporate a "2020 Agreement." No 2020 Agreement was ever executed by Plaintiff, ever provided to Plaintiff, or has ever been produced by Defendants in fully-executed form. No 2023 Agreement was ever provided to Plaintiff prior to the mediation. The 2020 and 2023 Agreements are collectively referred to as the "Alleged Agreements."

68.     Even if the 2023 Agreement were otherwise enforceable, its own Section 11(b) conditions any IP assignment on EY first preparing and presenting assignment documents — a condition EY never satisfied at any stage of the Component Suite's development, funding, knowledge transfer, or post-separation exploitation.

## CLAIMS FOR RELIEF

Each Count incorporates by reference all preceding paragraphs.

### COUNT I — DEFEND TRADE SECRETS ACT

18 U.S.C. § 1836 — Against All Defendants

**69.**     The Component Suite, including its architecture, modular design, underlying algorithms, schema-creation methodology, synthetic data generation techniques, harmonization logic, FDA integration methodology, and domain-specific implementation strategy and frameworks, constitutes trade secrets under 18 U.S.C. § 1839(3).

**70.**     The Component Suite derives independent economic value from not being generally known to or readily ascertainable by the public or competitors, as demonstrated by $8.9 million in confirmed commercial engagements and a $300+ million projected pipeline and the repeated, urgent requests for knowledge transfer by Defendant Hussain and others.

**71.**     Plaintiff took reasonable measures to maintain secrecy: all MVP development was conducted on personal equipment with personal licenses; demonstrations were conducted within EY's controlled confidential client engagement environment without disclosure of architectural details; and source materials were maintained under restricted access with limited need-to-know disclosure.

**72.**     Plaintiff independently developed all eight MVP Components beginning January 2024, prior to any EY directive, using personal equipment and more than $6,000 in documented personal capital; those Components constitute trade secrets entirely outside EY's scope-of-employment claim.

**73.**     Post-July 9, 2024 refinements — including the FDA integration directed and supervised by Plaintiff and built by EY GDS and Finance competency personnel under Plaintiff's direction — constitute refinements to pre-existing IP, not new inventions within EY's employment scope; in any event, EY executed no assignment instrument for any such refinements.

**74.**     Defendants acquired knowledge of and access to the trade secrets through Plaintiff's employment and specifically through the July 9, 2024 engagement.

**75.**     Defendants' subsequent use, disclosure, and commercial exploitation of the Component Suite after Plaintiff's separation — including through client demonstrations and transfer of know-how to successor personnel — constitutes misappropriation under 18 U.S.C. § 1839(5) in that Defendants used the trade secrets without Plaintiff's consent under circumstances giving rise to a duty to maintain their secrecy.

**76.**     Defendants' misappropriation was willful and malicious: Hussain's contradictory July 30 and August 1 communications, the GTER fabrication, the knowledge-transfer demand made without disclosure of the imminent separation, the FDA integration directed without any assignment instrument, and the FY2026 funding approved for a platform EY never validly acquired collectively establish a deliberate, coordinated scheme to acquire Plaintiff's trade secrets while eliminating the obligation to compensate him, entitling Plaintiff to exemplary damages under 18 U.S.C. § 1836(b)(3)(C).

**77.**     Plaintiff has suffered and continues to suffer damages including lost compensation, lost royalty value, and ongoing competitive harm, and faces irreparable harm from EY's continued use and disclosure of the trade secrets for which there is no adequate remedy at law.

**78.**     Plaintiff is entitled to: (a) compensatory damages not less than $16,000,000; (b) exemplary damages up to twice the compensatory award; (c) attorneys' fees; and (d) preliminary and permanent injunctive relief.

## COUNT II — CONVERSION

New York Common Law — Pled in the Alternative to Count I

Against EY US, EY Global, EY GDS, and Hussain

**79.**     Plaintiff owned and had an immediate right to possession of the tangible and intangible embodiments of the Component Suite, including source code, design specifications, technical documentation, prototypes, and hardware funded with Plaintiff's documented personal capital.

**80.**     Without Plaintiff's consent and without legal authority, Defendants intentionally assumed and exercised dominion and control over Plaintiff's proprietary materials, excluded Plaintiff from access and control following separation, and retained and continued to use those materials for Defendants' commercial benefit.

**81.**     As a direct and proximate result of Defendants' conversion, Plaintiff has suffered damages not less than $10,000,000.

## COUNT III — UNJUST ENRICHMENT

New York Common Law — Pled in the Alternative

Against EY US, EY Global, and EY GDS

**82.**     Defendants obtained substantial benefits from Plaintiff's development and deployment of the Component Suite, including: (a) $8.9 million in confirmed commercial engagements; (b) receipt and deployment of FY2026 capital approved by Defendant EY Global for use of a suite of components Plaintiff built, with no benefit directed to Plaintiff; (c) transfer of the Component

Suite's architecture and methodology to successor EY personnel; and (d) ongoing commercial deployment following Plaintiff's separation without compensation.

**83.**     It would be inequitable and unjust to permit Defendants to retain those benefits — confirmed at $8.9 million with a $300 million projected pipeline — without compensating Plaintiff.

## COUNT IV — QUANTUM MERUIT

### New York Common Law — Pled in the Alternative

### Against EY US, EY Global, and EY GDS

**84.**     Plaintiff rendered substantial services to develop, build, and deploy the Component Suite — including at least 500 hours of FY2025 development time, more than $6,000 in personal capital, prosecution of accepted provisional patent applications, direction of the FDA integration, and conducting more than 20 client demonstrations of the Component Suite — under circumstances in which Defendants knew Plaintiff expected compensation.

**85.**     The reasonable value of Plaintiff's services is demonstrated by the $5.7 million in platform-attributable revenue in pre-separation dashboard records, EY's designation of the Platform as a commercial "Service Disruptor," the FY2026 funding approved for its deployment, and EY's continued use following separation.

**86.**     Defendants have not compensated Plaintiff for the reasonable value of those services, entitling Plaintiff to recovery of not less than $10,000,000.

## COUNT V — BREACH OF FIDUCIARY DUTY

Delaware and New York Partnership Law — Independent of Any Alleged Agreement

Against Hussain, Gusher, and EY US

87.     By virtue of EY US's structure as a limited liability partnership and Mr. Rehman's status as a Principal within that partnership, Defendants Hussain and Gusher, and EY US acting through its officers, owed Mr. Rehman fiduciary duties of loyalty, good faith, and fair dealing arising under Delaware partnership law and New York common law — duties that exist independently of any written agreement and survive a declaration that the Alleged Agreements are void.

88.     Defendants breached those fiduciary duties through a sustained documented course of conduct: publicly disparaging the Component Suite to 12+ Principals on July 30, 2025 to depreciate its value in Plaintiff's performance record while commercially deploying it on August 1, 2025; concealing EY's intent to appropriate the Component Suite while demanding knowledge transfer; fabricating GTER in order to manufacture a pretextual basis for separation; directing Gusher's confidentiality breach that destroyed Plaintiff's Finance competency transfer opportunity; and denying Plaintiff access to his own performance and HR records to prevent him from challenging the fabricated metrics.

89.     Each of these acts constituted a breach of the duty to act loyally and in good faith toward a fellow member of the partnership in matters relating to the firm's business.

90.     As a direct and proximate result, Plaintiff suffered damages in excess of $16,000,000, including loss of IP compensation, loss of the Finance transfer opportunity, diminished final-year withdrawal compensation, and the professional standing Defendants' breach destroyed.

## COUNT VI — DEFAMATION PER SE

New York Common Law

Against EY US, Sande, Monroy, Hussain, Gusher, and Castaneda

**91.**     Defendants published false statements of fact concerning Plaintiff to EY partners, principals, and leadership personnel with access to EY's internal systems.

**92.**     The LCN falsely stated that Plaintiff exhibited "dishonesty," "poor judgment," and "lack of integrity" — statements directly impugning Plaintiff's character, professional ethics, and fitness to practice — and was communicated to EY leadership.

**93.**     On September 30, 2025, Defendants caused a revenue figure of $1.3 million to be entered into EY's firm records despite the $5.7 million reflected in Plaintiff's pre-separation dashboard, materially misrepresenting Plaintiff's professional contribution.

**94.**     Defendant Gusher disclosed confidential ethics investigation details to EY partners, causing colleagues to ask Plaintiff directly "what happened between you and Traci," establishing publication to third parties.

**95.**     Those statements were false and were made with knowledge of their falsity or reckless disregard for truth.

**96.**      The statements constitute defamation per se because they directly and adversely affected Plaintiff's fitness and standing in his profession, imputed serious misconduct, and have caused quantifiable harm to Plaintiff's professional reputation, employability, and earning capacity.

**97.**      As a direct and proximate result, Plaintiff has suffered reputational harm, loss of prospective employment and business opportunities, and other consequential damages in an amount to be proven at trial.

**COUNT VII — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

New York Common Law

Against EY US, Sande, Monroy, Hussain, and Castaneda

**98.**      Defendants engaged in a sustained, multi-act pattern of extreme and outrageous conduct directed at Plaintiff, including: (a) issuing a pretextual LCN falsely branding a fifteen-year EY professional as dishonest and lacking integrity while capping his compensation; (b) conducting a T&E investigation targeting only employees aged 44–51; (c) demanding knowledge transfer of the Component Suite without disclosing the separation decision already made; (d) producing a 2023 Agreement for the first time in mediation that references a 2020 Agreement never produced in executed form; (e) refusing to provide Plaintiff with his own HR file and ethics investigation notes; (f) entering a false $1.3 million revenue figure into firm records on Plaintiff's final day while simultaneously terminating his system access; and (g) commercially exploiting the Component Suite after separation without any IP assignment and without any compensation.

**99.**      Defendants' conduct was intentional or reckless in that Defendants knew their actions would cause Plaintiff severe emotional distress.

**100.**   As a direct and proximate result, Plaintiff suffered severe emotional distress requiring medical treatment and medication beginning as early as April 2025 and continuing through and after September 2025, in an amount to be proven at trial.

### COUNT VIII — SOX SECTION 806 RETALIATION

18 U.S.C. § 1514A

Against EY US, Sande, Monroy, Hussain, Castaneda, and Sharrer

**101.**   Plaintiff is a covered employee under SOX Section 806, 18 U.S.C. § 1514A, as a principal of EY US, which provides audit and advisory services to SEC-registered public companies. EY is judicially estopped from contesting Plaintiff's employee status in this Court: in *Ghose v. Ernst & Young LLP*, No. 1:22-cv-07881 (S.D.N.Y.), ECF No. 18 (Nov. 28, 2022), EY admitted in this same Court that Principals bear the title of "non-CPA equivalent to a Partner at EY" and that the plaintiff in that action was "employed by EY" — admissions directly inconsistent with any contention here that Plaintiff was a non-employee partner exempt from statutory employee protections.

**102.**   Between January and June 2025, Plaintiff engaged in protected activity by reporting to EY Human Resources, EY's internal Investigations Lead, EY's ethics hotline, and EY's Partner/Principal Council his reasonable belief that EY engaged in practices constituting violations of SEC rules, PCAOB standards, and securities laws: (a) Materially underreporting partner and principal hours on Client A's engagement — Client A being a publicly traded NASDAQ company — inflating reported profitability margins by more than 10% in violation of 15 U.S.C. § 78m(b)(2) and SEC Rules 13b2-1 and 13b2-2; and (b) Misrepresenting engagement profitability in firm records in a manner affecting client-facing disclosures to SEC registrants.

**103.**     Each relevant Defendant had actual knowledge of Plaintiff's protected disclosures at the time of each adverse action: Monroy and Sharrer from the T&E investigation itself; Sande from Plaintiff's April 16, 2025 written escalation; Hussain as Plaintiff's direct supervisor; and Castaneda from Plaintiff's June 10, 2025 ethics complaint.

**104.**     Defendants took the following adverse actions: (a) April 7, 2025: LCN issued falsely characterizing Plaintiff as dishonest and capping compensation — seventy days after Plaintiff's first protected disclosure; (b) August 6, 2025: Separation notice issued — fifty-seven days after ethics complaint and fourteen days after its dismissal with zero findings; and (c) September 30, 2025: Employment terminated, false $1.3 million GTER entered into permanent records, and system access terminated simultaneously — fifty-five days after Plaintiff filed EEOC Charge No. 520-2025-07690.

**105.**     Plaintiff's protected activity was a contributing factor in each adverse action within the meaning of 18 U.S.C. § 1514A(b)(2)(C).

**106.**     Temporal proximity, Defendants' actual knowledge of the protected disclosures at the time of each adverse action, the pretextual characterizations of Plaintiff's conduct, and the T&E investigation selection comprised entirely of employees ages 44–51 collectively establish contributing-factor causation.

**107.**     EY cannot demonstrate by clear and convincing evidence that it would have taken any adverse action absent the protected activity.

**108.**     As a result, Plaintiff is entitled to all remedies available under 18 U.S.C. § 1514A(c), including reinstatement or front pay, back pay with interest from April 7, 2025, compensatory damages, and attorneys' fees.

## COUNT IX — NEW YORK LABOR LAW — UNPAID WAGES AND UNLAWFUL DEDUCTIONS

N.Y. Lab. Law §§ 193, 195, 198; Wage Theft Prevention Act

Against EY US

**109.**     Under the economic reality test applied by New York courts, Plaintiff was an employee of EY for purposes of the New York Labor Law: EY controlled the means and manner of his work, set his schedule and performance targets, directed his client assignments, exercised exclusive control over his compensation, and provided upon his separation the federally mandated OWBPA disclosure — a disclosure federal law requires only for employees, not independent partners. EY is further judicially estopped from asserting Plaintiff's partner status before this Court, having admitted in *Ghose v. Ernst & Young LLP*, No. 1:22-cv-07881-RA-VF (S.D.N.Y.), ECF No. 18, that Principals are "employed by EY" and that their relationship with EY ended as "employment" upon separation — not as a redemption of partnership interests.

**110.**     EY violated N.Y. Lab. Law § 193 by making unlawful deductions from Plaintiff's wages, including: (a) reducing his final-year allocation based on a fabricated GTER figure; (b) imposing the extra-contractual LCN compensation cap without authorization; and (c) failing to credit Component Suite client engagements to his compensation calculation.

**111.**     EY violated N.Y. Lab. Law § 195 by failing to provide accurate wage statements.

112.    Plaintiff seeks all unpaid wages, liquidated damages in an equal amount pursuant to N.Y. Lab. Law § 198(1-a), accurate corrective wage statements, and attorneys' fees.

## COUNT X — CIVIL CONSPIRACY

New York Common Law

Against Hussain, Gusher, Sande, Sharrer, Castaneda, and Monroy

113.    Defendants Hussain, Gusher, Sande, Sharrer, Castaneda, and Monroy combined and agreed to accomplish by unlawful means the misappropriation of Plaintiff's Component Suite and elimination of his compensation claim through fabricated performance metrics. The unlawful acts in furtherance of the conspiracy include the misappropriation alleged in Count I, the defamation alleged in Count VI, and the breach of fiduciary duty alleged in Count V.

114.    Each Defendant performed overt acts in furtherance of the conspiracy, including: Monroy and Sharrer initiating the T&E investigation targeting only employees ages 44–51; Sande issuing the defamatory LCN and declaring it final without any appeal; Gusher breaching ethics confidentiality to destroy Plaintiff's Finance transfer opportunity; Hussain entering a materially false GTER figure on Plaintiff's final day while simultaneously terminating his system access; and Castaneda and Monroy jointly executing the termination notice on the same day as Plaintiff's EEOC charge.

115.    The conspiracy is evidenced by: (a) the coordinated T&E investigation initiated by Monroy and Sharrer targeting only principals ages 44–51; (b) Sande's LCN issued seventy days after Plaintiff's first protected disclosure, declared final with no appeal; (c) Gusher's direction to

Hussain to demand knowledge transfer concurrent with her confidentiality breach destroying Plaintiff's Finance transfer; (d) Hussain's contradictory July 30 and August 1 communications requiring advance coordination; (e) the synchronized 14-day gap between ethics dismissal and separation notice, with Castaneda and Monroy jointly executing the termination; and (f) Hussain's entry of the false $1.3 million GTER on Plaintiff's final day simultaneous with termination of his system access.

**116.**     Each Defendant committed overt acts in furtherance of the conspiracy.

**117.**     As a direct and proximate result, Plaintiff suffered damages jointly and severally attributable to all conspirators in an amount to be proven at trial.

## COUNT XI — DECLARATORY JUDGMENT — INVALIDITY OF ALLEGED 2020 AND 2023 AGREEMENTS

28 U.S.C. § 2201

Against EY US and EY Global

**118.**     An actual and justiciable controversy exists regarding the validity and enforceability of the purported 2023 Agreement, produced for the first time during the November 2025 mediation, and the 2020 Agreement it purports to incorporate.

**119.**     No 2020 Agreement was ever executed by Plaintiff, presented to Plaintiff, or delivered to Plaintiff. No 2020 Agreement has been produced in fully-executed form.

**120.**    The 2023 Agreement's supersession clause references a non-existent predecessor and is void on its face; the 2023 Agreement was never made available to Plaintiff as required by its own Section 1(c); and no executed copy bearing Plaintiff's signature has been produced.

**121.**    Plaintiff seeks a declaration that: (a) no valid 2020 Agreement exists; (b) the 2023 Agreement fails for lack of assent, non-existence of the referenced 2020 Agreement, and failure of the Section 1(c) delivery condition; (c) no arbitration obligation arises from either document; and (d) this action may proceed in this Court.

## COUNT XII — DECLARATORY JUDGMENT — INTELLECTUAL PROPERTY OWNERSHIP

28 U.S.C. § 2201

Against EY US, EY Global, and EY GDS

**122.**    An actual and justiciable controversy exists regarding ownership of the Component Suite and all constituent components.

**123.**    Plaintiff independently conceived and began developing a minimal viable product ("MVP") for the eight Components in January 2024, prior to any EY directive, using personal equipment and more than $6,000 in documented personal capital.

**124.**    Defendants have not produced any executed written assignment signed by Plaintiff transferring IP rights in the Component Suite.

125.    To the extent any portion of the Component Suite was refined after July 9, 2024, EY's own governing framework conditioned any IP assignment on EY first preparing and presenting assignment documents — a condition precedent EY never satisfied.

126.    Plaintiff seeks a declaration that: (a) Plaintiff is the sole owner of the Component Suite and each constituent component, including all provisional patent rights, design rights, and trade secret rights; (b) no valid assignment of Plaintiff's IP rights was ever executed; (c) Defendants hold no ownership interest, license, or right to use or commercialize the Component Suite; and (d) any continued use by Defendants constitutes misappropriation and conversion of Plaintiff's property.

## COUNT XIII — PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

18 U.S.C. § 1836(b)(3)(A); 28 U.S.C. § 2202

Against All Defendants

127.    Plaintiff satisfies each element for injunctive relief: (a) **Likelihood of Success.** Plaintiff independently developed all eight MVP Components on personal equipment before any EY directive. Defendants have continued to use and commercially exploit the Component Suite without any IP assignment and without compensating Plaintiff. (b) **Irreparable Harm.** Defendants' continued use causes ongoing harm that is inherently difficult to quantify: erosion of the Component Suite's competitive value; transfer of proprietary architecture to successor personnel and third parties; damage to Plaintiff's ability to independently commercialize the Component Suite; and risk of spoliation as Defendants continue integrating the Platform into commercial products. Monetary damages alone are inadequate. (c) **Balance of Equities.** An injunction would require only that Defendants cease using property they do not own. Any disruption is the direct result of their own unauthorized use. Absent an injunction, Plaintiff suffers

irreparable harm with no ability to recapture value. (d) **Public Interest.** Enforcement of trade secret law protects the public. Defendants' exploitation of the Component Suite in engagements with SEC-registrant clients without disclosing disputed ownership raises concerns regarding the integrity of professional services to public companies.

128.     Plaintiff respectfully requests: (a) a TRO and preliminary injunction prohibiting Defendants from using, disclosing, demonstrating, licensing, or exploiting the Component Suite pending final judgment; (b) an order requiring Defendants to identify all current uses and all personnel with access to source materials; and (c) a permanent injunction upon final judgment.

## IV. RESERVATION OF RIGHT TO AMEND

129.     Plaintiff expressly reserves the right to amend this Complaint upon receipt of Right-to-Sue notices from the EEOC with respect to Charge Nos. 520-2025-07690 and 520-2026-01416, which allege discrimination and retaliation on the basis of age and sex under the ADEA, Title VII, the New York State Human Rights Law, and the New York City Human Rights Law.

130.     Plaintiff anticipates amending as of right under Fed. R. Civ. P. 15(a)(1) to assert those claims, supported by the OWBPA statistical evidence that 27 of 28 principals in the PP Capacity Review were over age 40.

131.     Nothing in this Complaint constitutes a waiver of any reserved claim.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Musaddiq Rehman respectfully requests that this Court enter judgment in his favor and award the following relief:

A.      A TRO and preliminary injunction prohibiting Defendants from using, disclosing, demonstrating, licensing, or exploiting the Component Suite pending final judgment;

B.      A permanent injunction requiring Defendants to account for and disgorge all profits derived from use of the Component Suite;

C.      A declaration that: (i) Plaintiff is the sole owner of the Component Suite; (ii) no valid IP assignment was ever executed; (iii) Defendants hold no ownership interest or right to use or commercialize the Component Suite; and (iv) no arbitration obligation arises from the nonexistent or unexecuted 2020 or 2023 Agreements;

D.      Compensatory damages under Count I (DTSA) not less than $16,000,000;

E.      Exemplary damages under 18 U.S.C. § 1836(b)(3)(C) up to twice the compensatory award;

F.      Compensatory damages under Count II (Conversion) not less than $10,000,000, jointly and severally;

G.      Restitution under Count III (Unjust Enrichment) of all amounts by which EY has been unjustly enriched, including the $8.9 million in confirmed engagements and $2.3 million in FY2026 funding;

H.      Quantum meruit recovery under Count IV not less than $10,000,000, in the alternative;

I.      Damages under Count V (Breach of Fiduciary Duty) in excess of $16,000,000;

J.      Compensatory and punitive damages under Count VI (Defamation Per Se);

K.      Compensatory and punitive damages under Count VII (IIED) including medical costs from April 2025 forward;

L.      SOX remedies under Count VIII pursuant to 18 U.S.C. § 1514A(c): reinstatement or front pay, back pay with interest from April 7, 2025, compensatory damages, and attorneys' fees;

M.      Under Count IX (NYLL): all unpaid wages, liquidated damages in an equal amount, corrective wage statements, and attorneys' fees;

N.      Joint and several liability under Count X (Civil Conspiracy) for all compensatory and punitive damages;

O.      Disgorgement of all profits derived from misappropriation and unjust enrichment;

P.      Attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3)(D) and 18 U.S.C. § 1514A(c)(2)(C);

Q.      Pre- and post-judgment interest as permitted by law;

R.      Leave to amend upon receipt of Right-to-Sue notices; and

S.      Such other and further relief as this Court deems just and proper.

## VI. JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

/s/ Omer Waqas Khwaja

Omer Waqas Khwaja

KHWAJA LEGAL SERVICES, PLLC

708 Main Street, FL #10

Houston, TX 77002

646-226-2198

omer.khwaja@khwajalaw.org

Counsel for Plaintiff Musaddiq Rehman

Dated: March 5, 2026

## **EXHIBIT INDEX**

**Exhibit Title**

A      OSHA Procedural Dismissal — January 14, 2026

B      Last Chance Notice — April 7, 2025

C      Provisional Patent Applications (accepted, filed November 2025, conception date January 2024)

D      Plaintiff's April 16, 2025 Time and Expense Guidance Request

E      Molina Monroy Separation Email — August 6, 2025

F      PP Capacity Review Required Disclosure — August 11, 2025

G      HR File and Ethics Notes Requests and Denied — September 16–19, 2025